DECISION. *Page 2 
{¶ 1} In a nine-count indictment, defendant-appellant Lonnie Webster was charged with two counts of kidnapping, theft of an automobile, aggravated robbery, two counts of felonious assault, two counts of having a weapon while under a disability, and murder, with accompanying specifications for being a repeat violent offender and for possessing an automatic firearm when the offenses occurred. The charges stemmed from the following 2006 events in Cincinnati: the January 14 murder of Rob Pursley in Hyde Park, the February 14 robbery of a Walnut Hills barbershop, and the June 1 kidnapping of Deatra Langford's children.
 {¶ 2} A string of circumstantial evidence interwove Webster's involvement in each of these three events, and consequently the murder, robbery, and kidnapping charges were joined and tried together. A jury found Webster guilty on all counts, and the court imposed an aggregate term of 80 and one-half years' to life imprisonment.
 {¶ 3} Before sentencing was completed, Webster had engaged in an expletive-ridden tirade directed at the trial court. For that outburst, Webster was found guilty of four counts of contempt of court and sentenced to an additional 120 days' incarceration.
 {¶ 4} Webster's assignments of error challenge (1) the joinder of the murder, robbery, and kidnapping offenses in a single trial; (2) the trial court's denial of his new-trial motion based on jury misconduct; (3) the admission of other-acts evidence; (4) the failure to instruct the jury on the lesser-included offenses of abduction and unlawful restraint, as well as the failure to define "substantial risk" to *Page 3 
the jury in connection with the kidnapping counts; (5) prosecutorial misconduct during closing argument; (6) the denial of his request to examine the grand-jury testimony; (7) the weight and sufficiency of the evidence used to convict him; and (8) the four convictions for contempt of court. We affirm.
 I. The Hyde Park Homicide of January 14, 2006 {¶ 5} Rob Pursley was murdered in the parking lot of Mulligan's Hyde Park Pub in January of 2006. That evening, Pursley had driven from Turfway Park in Florence, Kentucky, to Mulligan's, with friends Rachel Cook and Lindsay Leone following separately in Leone's car. The three had attended a party hosted by Pursley's company and had later decided to meet other colleagues at Mulligan's. Around 6:15 p.m., Pursley drove into Mulligan's parking lot and courteously passed an open parking spot so that Cook and Leone, who were right behind him, could park near the entrance. As Pursley proceeded to the next available parking spot, Cook and Leone lost sight of his car.
 {¶ 6} After about 20 seconds of gathering their belongings, Cook and Leone began to exit from Leone's car. As the women were doing so, they heard a loud popping sound.
 {¶ 7} Cook testified that she had heard a single "sharp snap or crack" that she believed was a gunshot. She turned her head, looked out the window, and was then pulled back into the car by Leone, who had seen another car near the shooting. After being pulled back into the car, Cook looked out the window and saw a man falling to the ground, a light-colored car next to the man, and then the taillights of that car as it pulled out of the parking lot. Cook stated that she did not know how long she had fixated on the car, but that "it [had] seemed like a long time." *Page 4 
 {¶ 8} Cook then called 911 and began to run toward the fallen person. As she traversed the parking lot, Cook noticed that the man was grabbing at his lower torso and leg and writhing in pain. At some point, Cook realized that the fallen man was Pursley, and she took her belt off to use as a tourniquet. Cook could not find where the bullet had entered, and Pursley was unable to tell her where he had been shot. The women went inside Mulligan's to give the 911 operator the bar's address and, once inside, feverishly explained that there had been a shooting in the parking lot and that their friend had been injured. Several patrons immediately ran to Pursley's aid, but it was unavailing. Pursley had been shot just below the hip in the upper thigh, and the location of the wound made the use of a tourniquet impossible. Pursley died a short time later.
 {¶ 9} An autopsy determined that the bullet, and possibly fragments of Pursley's femur, had completely severed Pursley's femoral artery, and that he had bled to death. Dr. Gary Utz, Chief Deputy Coroner for the Hamilton County Coroner's Office, testified that the patrons at Mulligan's could not have saved Pursley's life, and that "short of having trained medical personnel on the scene that could have actually isolated that vessel and stopped the bleeding, he could [not] have been saved."
 {¶ 10} Eyewitness testimony gave few clues. As we have noted, Cook testified at trial that she had seen a light-colored vehicle, but that she could identify neither the make nor the model. Several days later, Cook drew a picture from memory of the taillights of the vehicle that she had seen leaving the parking lot. An investigation of the crime scene yielded only a single shell casing. But the shell casing was unique, at least in Cincinnati — a 7.62 x 39-mm brass cartridge. No suspects were identified at the time. *Page 5 
 II. The Barbershop Robbery of February 14, 2006 {¶ 11} Exactly one month after the Hyde Park homicide, a barbershop in the Walnut Hills suburb of Cincinnati was robbed. That evening, Allen Gee and Damion Jackson were working at Supreme Blends on Gilbert Avenue, when two men entered the barbershop, one armed with a handgun and the other armed with an assault rifle. The bandits stole about $220, two pairs of sunglasses, and a gold chain. Gee was shot during the robbery.
 {¶ 12} The police were called, and on the day of the robbery a report was made where Gee related these facts: the suspects were a black male, age 15, and a black male, age 20, with "Bonafide Hustla" tattooed on his forehead; the 15-year-old black male was carrying the handgun and was the shooter; the suspect with the "Bonafide Hustla" tattoo was "armed with [an] SKS [assault rifle]" and was a former customer of Gee's. Though Gee had been shot in the right calf, the victims did not want to prosecute.
 {¶ 13} Officer Mark Schildmeyer heard a broadcast that had described one of the suspects of the barbershop robbery as a black male armed with an SKS assault rifle, with "Bonafide Hustler" tattooed on his forehead. Schildmeyer knew an individual named Lonnie Webster who had "Bonafide Hustla" tattooed on his forehead. Schildmeyer attempted to contact Gee for several weeks about the robbery, but Gee was nowhere to be found. Jackson had given the police a fictitious address, so he was likewise unavailable for questioning. We note that the police reports described the tattoo as "Bonafide Hustler," but Webster's tattoo reads "Bonafide Hustla." We are unsure which amalgamation of the words bona fide and *Page 6 
hustler is least improper, so for consistency we use "Bonafide Hustla" throughout the remainder of this opinion in reference to Webster's tattoo.
 {¶ 14} Several weeks after the robbery, Schildmeyer finally located Gee. An interview with Gee revealed that he knew that the police had been searching for Lonnie Webster in connection with the barbershop robbery. But Gee recanted many of the statements he had made to the police on the day of the robbery. Gee changed his original account to the police and told Schildmeyer that the tattoo on the robber's forehead said "Brownsville Hustler," not "Bonafide Hustla." He also told Schildmeyer that he knew the identity of the shooter, but would not divulge that information, and that the 15-year-old shooter's mother had given him money in exchange for his silence. At trial, Gee continued to recant his previous account, adding that he believed that he had told officers that the gun wielded by the "Bonafide Hustla" had been an AK-47, not an SKS.
 {¶ 15} The police investigative report indicated that the case could be solved with additional investigative time because Gee "knows shooter by `born hustler' tattoo on forehead [, and the shooter is] also a customer of shop." We are aware of the internal inconsistency in the police report, where another paragraph identified the 15-year-old black male as the shooter and the other suspect as having a "Bonafide Hustla" tattoo.
 III. The Homicide and the Barbershop Robbery — AConnection? {¶ 16} At that point in the investigation, the only tangible evidence in the Pursley murder was the 7.62 x 39-mm brass shell casing. On March 23, 2006, firearms examiner William Schrand issued a crime-lab report of his finding that the concentric-firing-pin impression and sidewall-ejector markings observed on the shell *Page 7 
casing were found in, but were not limited to, 7.62 x 39-mm chambered SKS-style semiautomatic rifles.
 {¶ 17} After hearing of the barbershop robbery, Homicide Detectives Jeff Schare and Kurt Ballman, who had been assigned to the Pursley murder, took interest in the barbershop robbery because they had heard on the news that one of the assailants had been armed with an SKS rifle. Schildmeyer later told Ballman that the suspect brandishing the SKS rifle also had "Bonafide Hustla" tattooed on his forehead.
 IV. Lamont Langford's Testimony {¶ 18} In late April 2006, Lamont Langford, an inmate at Queensgate Correctional Center, contacted police with information regarding the Pursley murder and the barbershop robbery. Langford told the police that Webster had been dating his sister, Deatra, and that Webster had told him that he had committed the homicide and the robbery.
 {¶ 19} Langford also told police that, while he was in jail at Queensgate, he had talked to Webster on the phone. In reviewing their recording of Langford and Webster's conversation, the police learned that Webster had referred to his SKS rifle as "the big thing." In the recorded conversation, Webster told Langford that "they speaking man." The recording revealed that Langford and Webster knew the conversation was being recorded, and that they spoke in code in an attempt to mask the subject of the conversation. Langford expressed confusion about which crimes "they" were speaking about, and he asked Webster if he meant that people were speaking about the barbershop. Webster replied, "Nah * * * about the one shit with the big thing." In an attempt to clarify, Webster revealed that there was a $5,000 reward for information involving "the one shit with the big thing." Again, Langford *Page 8 
was confused, and Webster, in attempting to explain, said, "Remember what I did, bro? I don't want to say it on the phone. Remember we let it chill for a while?" Langford replied, "Where we play the music, going down Tuesdays. Over there by my way?" Webster responded, "Yeah. But you know that was the first one for, for `06. * * * Probably standing out like that being like just the area or whatever like."
 {¶ 20} At trial, Langford helped to clarify the recorded phone conversation. He testified that he and Webster would go to Buffalo Wild Wings Grill Bar (commonly known as "BW3") every Tuesday. BW3 was in a shopping center located directly behind Mulligan's parking lot. Langford also testified that Webster had called him on the day of Pursley's murder, that Webster had admitted taking Deatra's car to Hyde Park and shooting a white boy, and that Webster had not thought that police had any leads because the news had reported that police were looking for a silver car, when Deatra had a beige Malibu.
 {¶ 21} Langford also testified that on February 14, 2006, a month after the Pursley murder, Webster had called him to ask for $20 because he had run out of gas in Walnut Hills. Langford testified that he had neither given Webster money nor brought him gas, that Webster had called him later, saying that he was going to rob somebody, and that, still later in the evening, Webster had admitted to having robbed the Walnut Hills barbershop while armed with the SKS rifle.
 V. The June 1, 2006, Kidnapping and Arrest of Webster {¶ 22} Months after the Hyde Park homicide and the Walnut Hills robbery, two of Deatra Langford's children were abducted by Webster. Deatra called the police to report the abduction and to inform them that Webster had driven off in her father's Lincoln Navigator. Police Officer Robin White responded. At trial, White *Page 9 
testified that Deatra was highly agitated, upset, crying, and angry, and that a physical altercation between Deatra and Webster had preceded the kidnapping and vehicle theft.
 {¶ 23} After Webster had absconded with the children, Deatra went to a neighbor's house and called Webster on his cellular phone, demanding that he bring the children back. Webster responded, "Fuck you, bitch. I'll kill these kids," and he hung up on her. Deatra told White that she knew Webster was dangerous, and that he "might do something to [her] kids because * * * he had killed the white boy in Hyde Park." Deatra's testimony and account of the kidnapping were corroborated by Officer White's testimony at trial.
 {¶ 24} Deatra spent hours pleading with Webster to release her children. At one point, she suggested that Webster drop the children off with either a friend or her babysitter. Webster replied that he would kill those individuals too. An Amber alert was issued. Eventually the children were found unharmed at Webster's grandmother's house. Webster was found in an apartment building on Ridge Road, hiding behind a refrigerator. He was arrested and transported to a police station for questioning.
 VI. Webster's Statements {¶ 25} Detective Craig Gregoire originally responded to the kidnapping investigation and later questioned Webster at the police station. Webster provided a recorded statement. He claimed that he did not remember threatening Deatra's children, but that if he had threatened them, he had done so in the heat of passion. He admitted to threatening Deatra's life. When confronted with Deatra's statements to the police and Officer Gregoire's account of her demeanor, Webster conceded, "If [Deatra] said I did, then I did." *Page 10 
 {¶ 26} During his initial investigation, Gregoire learned that Deatra had told Officer White that Webster "might do something to [her] kids because * * * he had killed the white boy in Hyde Park." So Gregoire contacted the homicide detectives investigating the Hyde Park murder to inform them that a suspect of interest had been arrested. After Officer Gregoire questioned Webster about the kidnapping, a follow-up interrogation was conducted by homicide detectives Schare and Ballman concerning the Hyde Park homicide. This interview was not recorded, but Detective Ballman testified at trial that, during the interview, Webster had claimed that, at the time of the Pursley murder, he had been in Atlanta with Deatra, in the hospital, and that his grandmother had the relevant paperwork. But the paperwork was never found, no Atlanta hospital had any record of treating a patient named Lonnie Webster in January of 2006, and Deatra's work schedule and trial testimony revealed that she had worked in Cincinnati on the night of the Hyde Park murder. Officer Gregoire testified that, when questioned about the barbershop robbery, Webster had smiled and replied that it had not been a robbery, but rather had been a personal issue that had turned into a ruckus.
 VII. Deatra's Conversations with Webster {¶ 27} Deatra testified that Webster had admitted his involvement in the Hyde Park murder and the barbershop robbery. She testified that, on the night of Pursley's murder, she had allowed Webster to borrow her 1998 beige Malibu, and that, later in the evening, Webster had returned to her apartment with the SKS rifle under his coat, upset and crying, and had told her that he had shot a white boy in Hyde Park. *Page 11 
 {¶ 28} About a week later, Deatra and Webster were watching the news when a story about the Pursley murder aired. The news story said that police were looking for a silver car. Deatra testified that Webster had said, "I told you they don't have any evidence. I told you I didn't do that in your car."
 {¶ 29} A few days after the barbershop robbery, Webster called Deatra and told her that police were looking for him in connection with the robbery. That night, Deatra saw a news story relating that police investigating the robbery were looking for two men, one with "Bonafide Hustla" tattooed on his forehead. Later, Webster called Deatra from a hotel and said that he was laying low because he had gotten into an argument with a person at the barbershop and had shot him.
 VIII. The Joinder of Offenses in a Single Trial {¶ 30} Webster's first assignment of error is that the trial court erred in refusing to grant his motion for separate trials. In his motion, he argued that consolidating the charges relating to the Hyde Park murder, the barbershop robbery, and the kidnapping prejudiced his right to a fair trial. To prevail on a prejudicial-joinder claim, the defendant must demonstrate affirmatively (1) that his rights were prejudiced, (2) that at the time that the trial court ruled on the motion to consolidate, he provided the court with sufficient information so that it could weigh the considerations favoring joinder against his right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in consolidating the charges for trial.[1] *Page 12 
 {¶ 31} Two or more offenses may be charged in the same indictment if the offenses are of the same or similar character, are based on the same act or transaction, are based on two or more connected acts or transactions, or are part of a common scheme or course of criminal conduct.[2] The law favors joining charges that are of the same and similar character because joinder conserves judicial resources, reduces the likelihood of incongruous results in successive trials before different juries, and diminishes the inconvenience to witnesses.[3]
 {¶ 32} Nevertheless, if it appears that a defendant could be prejudiced by the joinder, a trial court may grant a severance under Crim.R. 14. As the Ohio Supreme Court noted in State v. Lott, the prosecution can use two methods to negate such claims of prejudice. First, if one offense can be introduced under Evid.R. 404(B) at the trial of the other offenses, no prejudice can result from the joinder. This evidentiary rule recognizes that evidence of other crimes may "be admissible for * * * proof of motive, opportunity, intent, preparation, plan." Second, the state can refute a claim of prejudice by showing "that evidence of each of the crimes joined at trial is simple and direct."[4] In sum, any prejudice is negated if the evidence admissible for each offense is also admissible in the trial of the other offenses under Evid.R. 404(B), or if the evidence for each offense is sufficiently separate and distinct.[5]
 {¶ 33} The crux of Webster's separate-trials argument is that the three different crimes involved different times, locations, dates, victims, witnesses, investigating officers, and evidence. He also contends that hearing about the *Page 13 
kidnapping of young children, the barbershop robbery and shooting, and then a homicide would have invited "the jury to consider evidence of all the incidents in reaching a verdict for any one case."[6] As a result, claims Webster, the jury verdicts turned on the cumulative evidence presented, not on the individual evidence for each crime.
 {¶ 34} The state argues that the evidence for each crime was simple and distinct, and that the other-acts evidence would have been admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" at the trials of the other crimes, if the crimes had been tried separately.[7]
Other-acts evidence is admissible if there is "substantial proof that the alleged other acts were committed by the defendant" and if such evidence tends to show one of the matters enumerated in Evid.R. 404(B).[8]
 {¶ 35} In this case, mistaken identity was Webster's defense. Webster argued that the person who had perpetrated the robbery had "Brownsville Hustler," not "Bonafide Hustla," tattooed on his forehead. Thus, Webster's identity as the perpetrator of the barbershop robbery was in dispute. The circumstantial evidence connecting the perpetrator of the robbery to the Hyde Park murder was the SKS assault rifle that Gee had initially reported that the "Bonafide Hustla" carried, and that Detective Schrand had opined was the rifle used to shoot Pursley. Webster also raised questions of identity by citing Gee's recantation that the robber with the tattoo had been carrying an AK-47 assault rifle as opposed to an SKS assault rifle. *Page 14 
 {¶ 36} Detective Schrand testified that the ejector marking on the shell casing found in the Hyde Park homicide was consistent with an SKS rifle and inconsistent with the ejector markings of an AK-47. Additionally, the assault rifle used to kill Pursley was unique: Chief Deputy Coroner Utz testified that the most frequent firearm used in a homicide was a handgun, and that, in his ten-year career with the coroner's office, he had seen only three or fewer homicides where the murder weapon had been a high-powered assault rifle.
 {¶ 37} Finally, Deatra's testimony revealed that on the date of the kidnapping she was scared for her life and for the lives of her children because she knew that Webster was dangerous, that he had a violent history, that he often carried an SKS, and that he had admitted his role in the Hyde Park homicide and the barbershop robbery. So, during the kidnapping negotiation, Deatra's statements regarding Webster's violent past provided a lens through which the police could assess the risk Webster posed to the children. Further, the background information Deatra provided during the kidnapping investigation provided further corroborating evidence incriminating and identifying Webster as a perpetrator of the Hyde Park murder and the barbershop robbery.
 {¶ 38} We are convinced that the joinder of the charges did not prejudice Webster because the evidence of each offense was admissible under Evid.R. 404(B) to prove Webster's identity. Trial testimony revealed that homicides involving assault rifles were rare in Cincinnati. And the evidence — including the shell casing in the Hyde Park homicide, the police report identifying the suspect in the barbershop robbery as a black male with "Bonafide Hustla" tattooed across his forehead, Deatra's disclosures of Webster's confessions and history of violence, Langford's testimony *Page 15 
identifying Webster as the perpetrator of the homicide and robbery, and Webster's recorded jail call with Langford — was admissible both to identify Webster and to prove that the other acts had been committed by him.
 {¶ 39} Moreover, the evidence of the homicide, the robbery, and the kidnapping was simple and distinct. The facts of the homicide, the robbery, and the kidnapping were clearly distinct, and though the same witnesses would have been called in each case, we are convinced that the jury was able to, and did, segregate the offenses. Further, the trial court gave a separate instruction to consider the evidence for each count separately, and it is presumed that the jury followed the court's instructions.[9]
 {¶ 40} Additionally, our holding that the evidence was admissible under Evid.R. 404(B) extends to Webster's third assignment of error, in which he exerts that he was unduly prejudiced by Deatra's and Langford's testimony that he had admitted that he had shot an unidentified person and had left the SKS rifle with the body. He was not. Having determined that the aforementioned evidence was admissible and not unfairly prejudicial, we also conclude that Webster's convictions were not against the weight and sufficiency of the evidence.
 IX. The Mistrial Motion Based on Juror Misconduct {¶ 41} Webster also contests the trial court's decision overruling his motion for a mistrial. As we noted in State v. Tapke, "the trial court is in the best position to determine the nature of the alleged juror misconduct and the appropriate remedies for any demonstrated misconduct."[10] The decision whether to grant or deny a *Page 16 
mistrial lies in the sound discretion of the trial court, and the denial of a mistrial motion is subject to an abuse-of-discretion standard on review.[11]
 {¶ 42} From the record, it appears that the bailiff was contacted by Juror Seven about her outside communication with a relative. The trial court examined Juror Seven outside the presence of the other jurors, and when questioned, the juror told the court that her son had asked if she was on the "Bonafide Hustla" case, and that she had replied, "I am not allowed to talk about it." She said that her son had told her that he knew the "Bonafide Hustla," and that he was "real goofy." She also told the court that she had cut her son off and had told him that he needed to stop talking after he had begun saying, "[I]f the only evidence they have against him is the rat, a prison snitch * * *." The juror then stated that she would not be influenced by the outside communication, that she could decide the case based on the witnesses, and that she had not told any other juror about the communication.
 {¶ 43} Later, an alternate juror reported that, during lunch, she had overheard Juror Seven talking with two other jurors about the conversation with her son. On examination, it was revealed that Juror Seven had told the two jurors at the lunch table that her son had said something to her about the case, and that that had prompted the court to question her earlier.
 {¶ 44} Juror Seven was questioned again, and she said that she had only mentioned to the other jurors at lunch that she had communicated with her son, and that the outside communication had been the reason the court had questioned her earlier. *Page 17 
 {¶ 45} Webster moved for a mistrial, but the trial court denied the motion. Instead, the entire jury panel was questioned about Juror Seven. One member of the panel remembered overhearing another member of the jury asking Juror Seven only if she was still on the jury. All of the jurors said that they could remain fair and impartial, but the trial court excused Juror Seven and replaced her with an alternate juror.
 {¶ 46} Our review of the record convinces us that Juror Seven's communication with her son, her explanation to the jurors of that communication, and the resulting questioning by the court did not prejudice Webster. We note that the only information conveyed to the jury panel was that Juror Seven had talked to her son about the case; the substance of that communication was never revealed. Further, any prejudice that may have arisen from Juror Seven's outside communication was cured by her dismissal from the jury panel. Webster's assignment of error alleging prejudice resulting from juror misconduct is overruled.
 X. Instructing the Jury on Lesser-Included Offenses {¶ 47} Webster also argues that the trial court erred in denying his request to instruct the jury on abduction and unlawful restraint as lesser-included offenses of kidnapping.
 {¶ 48} A charge on a lesser-included offense is required when the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense.[12] *Page 18 
 {¶ 49} A person violates R.C. 2905.01(B)(1) if he knowingly creates a substantial risk of physical harm, by any means, to a minor victim while removing them by force, threat, or deception from the place where they were found. "Substantial risk" means a "strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances exist."[13]
 {¶ 50} Our review of the record convinces us that the evidence presented at trial would not have reasonably supported an acquittal on the kidnapping charge. Consequently, the trial court was not required to instruct the jury on the lesser-included offenses of abduction and unlawful restraint. Webster admitted that he had known the children were in the vehicle when he had driven off. An Amber alert ensued. And the evidence at trial overwhelmingly demonstrated that he had repeatedly threatened the children's lives, and that, in light of his violent past, his threats were far from idle.
 {¶ 51} Webster also argues that the trial court should have instructed the jury on the definition of "substantial risk," because otherwise the jury was left to speculate on what a "substantial risk" was. But Webster did not request that "substantial risk" be defined in the jury instructions, nor did he object to the absence of the definition. In this case, we do not decide whether the jury instructions were erroneous because the jury was not instructed on what constituted a "substantial risk"; rather, we hold that even if the jury instruction had included the R.C. 2901.01(A)(8) definition of "substantial risk," the outcome would not have been different. Consequently, no miscarriage of justice existed. *Page 19 
 {¶ 52} Under no reasonable interpretation of "substantial risk" could a jury have concluded that a "substantial risk of serious physical harm," as required by the kidnapping statute, did not exist. Webster had absconded with the children in a fit of rage and had repeatedly threatened their lives and the lives of others. In such a charged atmosphere, under any reasonable interpretation of the evidence, there existed a substantial risk of serious physical harm to the children.
 XI. Prosecutorial Misconduct {¶ 53} Webster also alleges prosecutorial misconduct during closing argument. Because he failed to object at trial to any of the cited instances of prosecutorial misconduct, he has waived all but plain error.[14]
 {¶ 54} A conviction will be reversed for prosecutorial misconduct only where it is clear that, in the absence of the prosecutor's comments, the jury would not have found the defendant guilty.[15] Though some of the assistant prosecutor's comments in this case were questionable at best, we are convinced that the jury would have found Webster guilty even if they had not been made. The assignment of error is overruled.
 XII. Availability of Grand-Jury Testimony {¶ 55} Webster also argues that the trial court erred when it did not disclose the grand-jury testimony of witnesses Kurt Ballman and Lamont Langford. At trial, Webster cited the potential for obtaining impeaching material as the basis for a particularized need to review the testimony. The trial court found no particularized *Page 20 
need for Langford's testimony, and after conducting an in camera review of Ballman's testimony, it decided that there were no inconsistencies. Generally, the accused is not entitled to inspect grand-jury testimony unless a particularized need for disclosure outweighs the need for secrecy. Neither our review of the record nor Webster's arguments have persuaded us to depart from the general rule that a defendant may not inspect grand-jury testimony. Consequently, Webster's assignment of error is overruled.
 XIII. Contempt of Court {¶ 56} Webster's final assignment of error charges the trial court with error in finding Webster guilty of contempt of court. During sentencing, the court told Webster that it hoped that he would never be released; Webster responded with several derogatory comments, including "fuck you, racist bitch, and racist shit." He also interrupted the court, saying that "you will never break me." And he asserted that he did not "give a fuck" if he was sentenced to an additional 120 days (30 days for each eruption). Findings of contempt are reviewed under an abuse-of-discretion standard.[16] Direct contempt is misbehavior that is committed in the presence of the court in its judicial function, and that obstructs the due and orderly administration of justice.[17]
 {¶ 57} Courts must carefully discern between words that are contemptuous only to the court's sensibilities (which are not punishable), and those that pose an actual or imminent threat to the administration of justice (which are punishable): "Because of the summary nature of a direct contempt conviction, the court must be *Page 21 
careful to guard against confusing actions or words which are contemptuous to the judge's personal feelings or sensibilities and actions or words which constitute punishable, criminal contempt of a summary nature because of posing an actual or imminent threat to the administration of justice."[18]
 {¶ 58} Just "sassing" a judge, even in grossly abusive language, is not in itself contempt. Thus, the unmannerly nature of the language alone is not the yardstick for measuring what constitutes direct contempt.[19] In this case, the verbal onslaught occurred before the court had finished its mandatory recitation of Webster's appellate rights, and it disrupted the proceedings and constituted a threat to the administration of justice.[20] Of course, had Webster's outbursts occurred after the mandatory formalities had ceased, Webster's position would be strengthened.[21] But that was not the case. Webster interrupted the court proceedings before the culmination of the required colloquy, and the trial court did not abuse its discretion in finding Webster guilty of contempt.
 XIV. We Affirm {¶ 59} Having found the entirety of Webster's appeal meritless, we affirm the trial court's judgment and confirm Webster's status as a bona fide inmate.
Judgment affirmed.
DINKELACKER and WINKLER, JJ., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] State v. Clifford (1999), 135 Ohio App.3d 207, 211,733 N.E.2d 621; State v. Torres (1981), 66 Ohio St.2d 340, 343,421 N.E.2d 1288.
[2] See Crim.R. 8(A); State v. Hamblin (1988), 37 Ohio St.3d 153,524 N.E.2d 476; Clifford, supra.
[3] See State v. Lott (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293;State v. Brotherton, 1st Dist. Nos. C-050121 and C-050122, 2006-Ohio-1747, at ¶ 17, citing State v. Thomas (1980),61 Ohio St.2d 223, 225, 400 N.E.2d 401.
[4] See State v. Franklin (1991), 62 Ohio St.3d 118, 122,580 N.E.2d 1.
[5] See State v. Echols (1998), 128 Ohio App.3d 677, 692,716 N.E.2d 728, citing State v. Wiles (1991), 59 Ohio St.3d 71, 77,571 N.E.2d 97.
[6] Echols, supra.
[7] Evid.R. 404(B).
[8] Echols, supra, citing State v. Lowe (1994), 69 Ohio St.3d 527,530, 634 N.E.2d 616.
[9] See State v. Loza, 71 Ohio St.3d 61, 75, 1994-Ohio-409,641 N.E.2d 1082.
[10] 1st Dist. No. C-060494, 2007-Ohio-5124.
[11] See State v. Sage (1987), 31 Ohio St.3d 173, 182, 510 N.E.2d 343;State v. McMillian (May 8, 1996), 1st Dist. No. C-950523.
[12] State v. Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus.
[13] R.C. 2901.01(A)(8).
[14] State v. Jones (2001), 91 Ohio St.3d 335, 352,744 N.E.2d 54.
[15] Id.
[16] See State v. Kilbane (1980), 61 Ohio St.2d 201, 400 N.E.2d 386, paragraph one of the syllabus; State v. Perkins 154 Ohio App.3d 631,2003-Ohio-5092, 798 N.E.2d 646, at ¶ 37.
[17] R.C. 2705.01; In re Lands (1946), 146 Ohio St. 589, 595,67 N.E.2d 433.
[18] State v. Conliff (1978), 61 Ohio App.2d 185, 189, 401 N.E.2d 469, citing In re Little (1972), 404 U.S. 553, 92 S.Ct. 659.
[19] See State v. Drake (1991), 73 Ohio App.3d 640, 644,598 N.E.2d 115
[20] See Crim.R. 32(B); State v. Johnson (Dec. 31, 1986), 12th Dist. No. CA85-12-105.
[21] See Drake, supra. *Page 1