DECISION. *Page 2 
{¶ 1} In separate indictments, defendant-appellant James Lester was charged with two counts of theft from the elderly, [1] robbery, [2]
and aggravated robbery.[3] Lester's case was tried to a jury, and he was found guilty and convicted of theft from the elderly and aggravated robbery. The trial court sentenced Lester to seven years on the aggravated-robbery conviction and to 18 months on each theft conviction. The terms were to be served consecutively for a total of ten years' incarceration.
 {¶ 2} After oral arguments in this case had been heard, the Ohio Supreme Court decided State v. Colon, [4] which announced a new constitutional norm for grand-jury indictments in Ohio. Colon held that it is structural error to omit an essential mens rea element from an aggravated robbery or robbery indictment.[5] We sua sponte granted leave for Lester to file a supplemental brief addressing issues raised by Colon. In light of Colon, we reverse Lester's conviction for aggravated robbery, but affirm his two convictions for theft from the elderly.
 {¶ 3} Lester had duped several "marks" into playing three-card monte — a "game" in which often an outside man pretends to conspire with the mark to cheat the inside man, while in fact conspiring with the inside man to cheat the mark. Generally, the game is played with three cards that are placed face down on a table or box. The dealer shows the target card, for example the ace of spades, then rearranges the cards quickly in attempting to confuse the player (or mark) about *Page 3 
which card is which. The mark then selects the card that is believed to be the ace of spades; if the mark is correct, they win; otherwise they lose. Misdirection and sleight of hand ensure that the mark never wins. And to that end, as Lt. Bruce Plummer testified at trial, the dealer often secretly holds a fourth card. The accomplice will walk by the game and pretend to be a disinterested party. The mark bets on the game and is usually allowed to win a number of hands. After betting several hundred dollars, the mark is encouraged to bet a larger sum. Then the dealer uses the fourth card, causing the mark to lose.
 {¶ 4} We now recite the facts more fully, identifying the victims of Lester's scams as Marks One, Two, and Three.
 I. Mark One {¶ 5} In mid-April 2006, Mark One withdrew $1,000 from the bank to tide him over till May. After withdrawing the money, Mark One went to an IGA grocery store, where he was approached by Lester. Lester asked Mark One the location of a certain Kroger store and for a ride. Mark One agreed. Lester and Mark One were soon joined by another man ("the accomplice"), who had identified himself as a Kroger employee. Later Lester and the accomplice asked Mark One to play three-card monte. The accomplice then flashed a roll of cash indicating his readiness and ability to play for money. Mark One and the accomplice played a few nominal games, and then Lester asked to count Mark One's and the accomplice's money. The accomplice's money was purportedly contained in a brown paper bag. For whatever reason, Mark One handed Lester the $1000 withdrawal, and Lester then commingled Mark One's $1,000 withdrawal into the brown paper bag that purportedly contained the accomplice's money. *Page 4 
 {¶ 6} While Lester held the bag containing Mark One's and the accomplice's money, the two continued the game. Eventually, the men told Mark One that they had to meet a woman but that the bag of cash would be stashed in Mark One's trunk in the interim. Mark One dropped the men off, gave the men the watch from his wrist to ensure that they knew when to regroup, and was to pick them up in an hour to resume their game.
 {¶ 7} Mark One returned home, checked the trunk of his car, and discovered that the bag in the trunk with the stash of cash was actually trash. He returned to the agreed meeting place, but the men were nowhere to be seen. Police later found Lester's fingerprints on Mark One's car. Defense counsel stipulated that the fingerprints were Lester's.
 II. Mark Two {¶ 8} On October 24, 2006, Lester approached Mark Two outside a U.S. Bank branch in Cincinnati. Mark Two had just withdrawn $1,800, placing the money in a briefcase, when Lester approached him and asked where "Pea Green Street" was located. Mark Two testified that Lester had said that he needed to find a woman who lived on "Pea Green Street." Mark Two replied that he had never heard of "Pea Green Street," but that he would give Lester a ride to the woman's workplace. At some point, Lester showed Mark Two what appeared to be a large sum of money that had been tightly wadded. Mark Two then advised Lester that carrying such a large amount of cash was foolish. After failing to find the woman for whom they had been searching, Mark Two parked his vehicle, and Lester began telling the mark that he had been engaged by bus-station patrons to play some sort of scam game.
 {¶ 9} An unidentified man began walking towards the vehicle, when Lester suggested that they solicit the man's advice on the scam. To make room, Lester *Page 5 
moved to the rear passenger side of the vehicle, and Mark Two moved the briefcase containing the cash to the rear driver's side of the vehicle (opposite Lester). The accomplice had indicated that he was a restaurant manager and that he had been on his way to the bank to make a deposit. Lester told the man about the scam game, and the unidentified man ("the accomplice") advised Lester that the inanity of returning to the bus stop to play the game was obvious. Then the accomplice laid out what was purported to be an altruistic plan to teach Lester a lesson and beseeched Mark Two to play along. The moral of Lester's lesson would be the ease at which a fleeceable dullard could be relieved of his bankroll. The vehicle used to teach the lesson would be a winner-take-all game of three-card monte.
 {¶ 10} In preparation for the game, the accomplice placed what was asserted to be the deposit in a bag; he asked Mark Two if he had any money to contribute to "the lesson," and Mark Two agreed to place $100 in the bag. They played, and unsurprisingly Mark Two lost his $100. Sensing Lester and the accomplice's chicanery, Mark Two retorted, "Wait a minute; I don't like what is going on here guys," and then asked to see the bag of money. The accomplice's bag was empty! Mark Two then snatched Lester's bag, retrieving his $100 in the process. This was a small victory indeed, because Lester had already taken the $1800 from the briefcase and, despite Mark Two's best effort to subdue Lester, had begun to flee.
 {¶ 11} Mark Two pursued Lester, but the chase ended when Lester threatened Mark Two with a knife. Mark Two then attempted to dial 911 on his cellular phone, but Lester swatted the phone out of his hand before he could call. A car then careened around the corner, and Lester leaped into the back seat. Mark Two later called the police and described the getaway vehicle as a gold car that had been licensed in Shelby County, Tennessee. Based on Mark Two's description, arresting officer Craig Kunz stopped a gold *Page 6 
vehicle that had been licensed in Shelby County, Tennessee. Lester was taken to the police station, where an inventory of his vehicle yielded a pocketknife and a $100 bill.
 III. Mark Three {¶ 12} On that same day in October 2006, Mark Three was mowing his lawn when Lester approached him and asked the location of "Pea Street" or "Pea Zone Street." Mark Three did not know. Lester then asked where the First Baptist Church was located and then offered $20 for a ride to the church. Lester flashed a roll of cash that was encircled by a $20 bill and stated that he needed to go to the church to meet with a woman concerning an apartment rental. On arrival, no woman, or apartments, or others awaited. Lester then asked that they ride to the Walgreens in Pleasant Ridge, Ohio. Mark Three agreed and on arrival Lester exited from the vehicle.
 {¶ 13} Lester returned with a man who professed to be a minister, and Lester recommended that they help the minister out. The unidentified minister (who we now refer to as "the accomplice") sat in the passenger seat, and Lester sat in the rear. On entering the vehicle, the accomplice suggested that the three men play three-card monte. Mark Three testified that, in this game, one card was different than the other two and that the object of the game was to pick out the different card.
 {¶ 14} So Mark Three picked the card that he thought was different, and Lester and the accomplice bet on whether he would be correct. After losing several hands, Lester evidently decided that he was not betting enough because he then doubled down. The accomplice then produced from his jacket an envelope emblazoned on its face with a handwritten "$4,000." The accomplice indicated that the envelope's contents had belonged to Walgreens and that they had been earmarked for deposit. The accomplice wagered the $4,000 envelope and lost to Lester. The accomplice then turned to Mark Three and with a wink of the eye said, *Page 7 
"We need to get this money back." Mark Three testified that the wink suggested that Lester was a "dummy" who did not know what he was doing. The accomplice then implored Mark Three to bet on the next hand. Mark Three produced his wallet containing about $100, and the accomplice placed the wallet and the envelope into a brown bag. The brown bag was then purportedly placed underneath Mark Three's seat. Because Lester continued to win, the accomplice transferred possession of the bag from Mark Three to Lester.
 {¶ 15} The accomplice then declared that he and Mark Three would have to win the money back or else he would lose his job; he then asked if Mark Three would withdraw money from his own account. Mark Three originally agreed but quickly reneged when he and the accomplice reached the bank. So they drove back to Walgreens to find Lester, and while en route the accomplice said that he would attempt to work out a deal with Lester. But no deal could be made. The accomplice again reiterated that the money had to be won back, or he might have to "get rid of both Mark Three and Lester. Mark Three testified that the threat impliedly meant that the accomplice was armed with a firearm.
 {¶ 16} The threat worked. Mark Three withdrew $3,000 and then returned to his vehicle. Lester then counted the $3,000 and placed it in a paper bag. Lester and the accomplice then directed Mark Three to open his trunk so that they could stash the bag of cash; he did, as did they — or so he thought.
 {¶ 17} Mark Three later indicated his belief that the men had collaborated in defrauding him. As Mark Three exited from his vehicle to check on the cash, Lester and the accomplice had already begun to walk away. They vanished. A check of the trunk revealed, once again, that the stash of cash was actually trash. And the accomplice was no manager of Walgreens. *Page 8 
 {¶ 18} This string of events earned Lester two separate indictments. One indictment charged two counts of theft from the elderly for his swindling of Marks One and Three. The other charged robbery and aggravated robbery for his run-in with Mark Two. The trial court consolidated the cases, and a jury found Lester guilty of aggravated robbery and theft from the elderly.
 IV. Assignments of Error {¶ 19} Lester's original appeal argued that his convictions were against the sufficiency and weight of the evidence, and that the trial court erred in (1) consolidating the cases (arguing also that trial counsel failed to object to the joinder); (2) overruling his continuance and new-counsel motions; (3) refusing to give a jury instruction on a lesser-included offense; (4) admitting the knife found in Lester's car as evidence; (5) allowing a juror to remain on the panel; and (6) imposing sentences contrary to law. We granted Lester leave to file a supplemental brief, and he has added one more argument: that his aggravated-robbery conviction was tainted by structural error. We reverse Lester's aggravated-robbery conviction, but affirm Lester's two theft-from-the-elderly convictions.
 V. Structural Error {¶ 20} Because the aggravated-robbery indictment omitted the essential mens rea element for the offense, Lester argues that his conviction was plagued by structural error. According to the Ohio Supreme Court, he's right. Structural errors mark an exception to the rule; the rule is that most errors, even constitutional errors, are reviewed for harmlessness.[6] But structural errors are categorically prejudicial — they always call for a new trial.[7] And structural errors are not waived by the *Page 9 
defendant's acquiescence at trial — they can be raised for the first time on appeal. Few errors have been found deserving of this stern treatment.[8] But the Ohio Supreme Court identified a new one in April.[9]
 {¶ 21} It is structural error when an indictment omits an essential mens rea element.[10] Ohio's high court so held in State v.Colon. Colon was charged and convicted of robbery. But his indictment, tracking the statutory language, omitted the mens rea element, which, because of the omission, was recklessness as implied by law.[11] Both parties agreed that the indictment was defective. The issue was whether Colon had waived appellate review by not objecting at, or before, trial. The court first noted that the Ohio Constitution guarantees grand-jury indictments for serious offenses.[12] The court added that the indictment's defect produced other serious errors: It failed to properly notify Colon of the charged crime; it led to defective jury instructions; and it permitted the state to imply that the crime was a strict-liability offense. (In this case, the trial court correctly instructed the jury on what would have been the proper mens rea element, i.e., knowingly, had that element not been omitted in the indictment. But under Colon this was without consequence because at inception the defective indictment tainted the entire process.) The court concluded that whenever an essential mens rea element is omitted from an indictment, the omission not only deprives criminal defendants of a constitutional right but also undermines the entire trial process.[13]
In short, the omission is structural error. Thus, Colon had not waived the issue by failing to object in the trial court. *Page 10 
 {¶ 22} The state argues that we should ignore Colon and followState v. Wamsley, State v. Adams, and State v. O'Brien;[14] and thatColon renders Crim. R. 7(D), Crim. R. 12(C), and R.C. 2941.29 meaningless. But we are an intermediate appellate court, bound to follow Ohio Supreme Court precedent.
 {¶ 23} Thus Lester was entitled to an indictment charging every essential element, but the indictment charging Lester with aggravated robbery omitted the mens rea element for the offense. Colon is directly on point. The Ohio Supreme Court has told us that this kind error is never harmless. Even though Lester did not raise this issue below, we still must reverse.
 {¶ 24} Our decision to reverse Lester's aggravated robbery conviction moots all other assignments of error relating to those charges. We review the remaining assignments of error only as they relate to the two remaining convictions for theft from the elderly.
 VI. Prejudicial Joinder {¶ 25} Lester argues that the trial court erred in consolidating the cases into a single trial, and that his trial counsel was ineffective in failing to object to the consolidation. Lester concedes that the joinder was not objected to at trial.
 {¶ 26} Generally, if the charged offenses are of the same or similar character, are based on two or more transactions connected together, or are parts of a common scheme or course of criminal conduct, then the offenses can be joined into the same *Page 11 
indictment and trial.[15] Joinder of charges is preferred because it facilitates judicial economy, consistent results, and witness convenience.[16]
 {¶ 27} We are convinced that joinder was proper in this case; consequently, in this respect counsel's assistance at trial cannot be considered ineffective. The state showed that Lester and an accomplice had carried out a common scheme and course of criminal conduct. Specifically, the mode of operation, on more than one occasion, had been to lurk outside a bank, to approach elderly citizens who had just made sizable withdrawals, and then, along with the accomplice, to trick the marks into playing three-card monte. The same trickery had been perpetrated against three different victims. In California, three-card monte is specifically prohibited by statute.[17] Joinder was proper, and counsel was effective.
 {¶ 28} Lester also argues that his convictions were not supported by the weight and sufficiency of the evidence. Not so. The jury heard testimony from all three marks. They each testified that Lester and an accomplice had conned them, employing various derivations of three-card monte. All three marks felt that they had been helping a person in need, but only one questioned Lester's intention — Mark Two testified that when he confronted Lester, Lester had threatened him with a knife.
 {¶ 29} Lester's defense had been that he was a good gambler, and that he had won the money from the three marks fair and square. But the evidence corroborated each of the marks' trial testimony. It was a jury question; the jury disbelieved Lester.
 {¶ 30} We conclude that the evidence was sufficient to sustain Lester's convictions, and that the jury did not lose its way in concluding that Lester was guilty. *Page 12 
 VII. Motions for Continuance and New Counsel {¶ 31} Lester next argues that the trial court erred in denying his continuance and new-counsel motions. Around mid-day on the day of trial, Lester requested a continuance based on an alleged "communication breakdown" with defense counsel. Lester's basis for the continuance and new-trial motions had been that defense counsel had "cursed at him" and had used the word "dammit."
 {¶ 32} An indigent defendant's Sixth Amendment right to counsel extends to competent counsel, but it does not guarantee a "meaningful" (whatever that means) attorney-client relationship. Even if we were to assume that Lester's counsel had used the language cited by Lester, that fact could not have sustained his motions. A defendant is not entitled to a meaningful relationship with his or her attorney, and a discharge is warranted only when the communication breakdown impinges on the defendant's right to effective assistance of counsel.[18]
 {¶ 33} On the day of trial, Lester's counsel stated that he was prepared for trial and for cross-examination of the state's witnesses. We are convinced that an accused's attorney's use of swear words alone does not deprive the accused of effective assistance of counsel. We hold that the trial court did not err in denying Lester's motions.
 VIII. Lester's Final Assignments of Error {¶ 34} Lester last argues that the trial court erred in its sentence and by allowing a juror who had worked with one of the marks to remain on the panel.
 {¶ 35} After listening to Mark Two's testimony, a juror informed the court that she and Mark Two had worked at the same company about ten years earlier. The court examined the juror and learned that Mark Two had worked for the *Page 13 
company part-time, for only a short period, and that the juror had very little interaction with Mark Two. The juror concluded that she could remain fair and impartial and that her association with Mark Two would not affect her consideration of the case. The court allowed the juror to remain on the panel.
 {¶ 36} A trial court has discretion to determine whether a juror can be impartial, and on review, its determination will not be disturbed absent an abuse of discretion.[19] The decision to grant or deny a mistrial is likewise reviewed under an abuse-of-discretion standard. Our review of the record fails to reveal any abuse of discretion. The record reveals but a tenuous relationship between the juror and Mark Two. The assignment of error is overruled.
 {¶ 37} Likewise, we summarily overrule Lester's final assignment of error, that the sentence was excessive. The sentence was within the appropriate statutory range. Lester's original assignments of error still lack merit, and we thus affirm the trial court's judgment regarding the two charges of theft from the elderly, but underColon we reverse his conviction for aggravated robbery, and remand the cause for further proceedings consistent with the law and this decision.
Judgment affirmed in part and reversed in part, and cause remanded.
SUNDERMANN, P.J., and DINKELACKER, J., concur.
[1] R.C. 2913.02(A)(3).
[2] R.C. 2911.02(A)(2).
[3] R.C. 2911.01(A)(1).
[4] 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917.
[5] Id. at ¶ 24.
[6] State v. Hill (2001), 92 Ohio St.3d 191, 197, 749 N.E.2d 643; see, also Rose v. Clark (1986), 478 U.S. 570, 579 106 S.Ct. 3101.
[7] State v. Fischer, 99 Ohio St.3d 127, 2003-Ohio-2761,789 N.E.2d 222.
[8] Johnson v. United States (1997), 520 U.S. 461, 468-469,117 S.Ct. 1544.
[9] See Colon, supra.
[10] Id. at ¶ 19.
[11] R.C. 2901.21(B).
[12] Colon, supra at ¶ 17, citing Section 10, Article I, Ohio Constitution.
[13] Id. at ¶ 32.
[14] 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45; (1980),62 Ohio St.2d 151, 404 N.E.2d 144; (1987), 30 Ohio St.3d 122,508 N.E.2d 144.
[15] See Crim. R. 8(A); State v. Hamblin (1988), 37 Ohio St.3d 153,524 N.E.2d 476.
[16] See State v. Webster, 1st Dist. Nos. C-070027 and C-070028, 2008-Ohio-1636, at ¶ 31, citing State v. Lott (1990),51 Ohio St.3d 160, 163, 555 N.E.2d 293; State v. Brotherton, 1st
Dist. Nos. C-050121 and C-050122, 2006-Ohio-1747, at ¶ 17, citingState v. Thomas (1980), 61 Ohio St.2d 223, 225, 400 N.E.2d 401.
[17] Cal.Penal Code 332; see, also, People v. Frigerio (1895), 107 Cal. 151, 40 P. 107.
[18] See Morris v. Slappy (1983), 461 U.S. 1, 103 S.Ct. 1610.
[19] State v. Thompson, 4th Dist. No. 06CA28,2007-Ohio-5419. *Page 1