DECISION.
{¶ 1} Jimmy Canyon appeals his convictions for aggravated robbery with a specification, felonious assault with a specification, and having a weapon while under a disability. He also appeals the trial court's judgment that revoked his community control for two prior convictions and imposed prison terms. We conclude that Canyon's assignments of error do not have merit, so we affirm the judgments of the trial court.
 Background {¶ 2} Canyon was indicted for two counts of aggravated robbery with a gun specification, two counts of felonious assault with a specification, and one count of having a weapon while under a disability. The case was tried before a jury.
 {¶ 3} During the trial, the state alleged that Anthony Hoover had contacted Brandon Denny to obtain some marijuana. According to the state, Denny's friend John Davis had the phone number of a potential seller nicknamed Tone Bud. At the trial, Tone Bud was identified as Anthony Nelson. When Davis called Nelson seeking marijuana, Nelson informed him that he had none. Another man then got on Nelson's phone and told Davis that he had marijuana to sell.
 {¶ 4} The man agreed to sell marijuana to Davis for $400. Davis, Denny, Hoover, and Chris Hill drove together in Hoover's Cadillac to meet the man. When they had arrived at the meeting place, a man approached the car. According to Davis and Denny, the man got into the back seat of the car, confirmed that Davis wanted a quarter pound of marijuana, reached into his pocket, pulled a gun out, and shot Davis in the groin. Davis testified that the man then demanded money, asking, "[Y]ou want your boy to take another one?" According to Denny, Hill gave the man $400, and the man exited from the car. Hoover, who had been driving the car, *Page 3 
attempted to hit the man with his car and then pursued the car from which the man had come. After the occupants of that car fled into the woods, the pursuit ended, and Hoover took Davis home.
 {¶ 5} Officer Kevin Marcum testified that he arrived at the place where the car had been abandoned, and that Isiah Bealer, Justin Nixon, and Darius Lemon had emerged from the woods nearby when he had approached the car. According to Officer Marcum, Bealer stated that he had been the driver of the car, and that the car had been chased by a white Cadillac.
 {¶ 6} Davis's parents took him to a hospital for treatment. The hospital personnel notified the police that there had been a shooting. Detective Christopher Pitsch responded to the hospital to investigate. In the course of the investigation, Officer Marcum contacted Detective Pitsch about the car that had been driven by Bealer. The police officers suspected that the car chase and the shooting were related. Eventually, Detective Pitsch traced Davis's phone call to Nelson's phone. When questioned, Nelson told Detective Pitsch that Jimmy Canyon had used his phone. Nelson also told police that Canyon went by the nickname J-Killa. Nelson later identified Canyon in a photographic array. Detective Pitsch testified that Bealer had told him that a person named Jimmy, or J-Killa, had been in his car the night that it had been chased. Later, Denny, Hoover, and Davis identified Canyon as the man who had entered Hoover's car and had shot Davis.
 {¶ 7} At the conclusion of the trial, the jury found Canyon guilty as charged. The trial court sentenced Canyon to eight years' incarceration for each of the aggravated-robbery counts, to seven years for each of the felonious-assault counts, and to four years for having a weapon while under a disability. The sentences for aggravated robbery were concurrent but were otherwise consecutive to the other *Page 4 
sentences, as were the sentences for felonious assault. Additionally, the trial court sentenced Canyon to a three-year term for the merged gun specifications. The aggregate prison term was 22 years.
 {¶ 8} Canyon had been previously convicted of robbery in the case numbered B-0305078B and assault in the case numbered B-0508366, and the trial court had imposed community control for those convictions. As a result of his new convictions, the trial court revoked his community control and imposed prison sentences of four years and one year, respectively, and made these sentences consecutive to the sentences it had already imposed. This appeal followed.
 The Indictment {¶ 9} In his first assignment of error, Canyon asserts that the trial court erred when it convicted him of two counts of aggravated robbery because the indictment for those counts failed to state the mens rea that the state had to prove.
 {¶ 10} In State v. Colon (Colon I), the Ohio Supreme Court held that an indictment that failed to state the mens rea for robbery was structurally defective, and that the defendant had not waived the error by failing to raise the issue at trial.[1] The court later clarified that the situation in Colon I was unique, and that structural-error analysis applies only to those rare cases "in which multiple errors at the trial follow the defective indictment."[2] "Seldom will a defective indictment have this effect, and therefore, in most defective indictment cases, the court may analyze the error pursuant to Crim. R. 52(B) plain-error analysis."[3] The difference is important. Structural errors are, by definition, prejudicial and must result in a new trial.[4] Under *Page 5 
a plain-error analysis, an error can be determined to be inconsequential by a reviewing court.
 {¶ 11} Before determining whether we should review the indictment in this case for structural or plain error, we consider the state's argument that the aggravated-robbery count in violation of R.C. 2911.01(A)(1) was not defective. According to the state, the offense is a strict-liability offense. But in State v. Lester, this court concluded that the failure to state the mens rea for aggravated robbery was defective.[5] We decline to overrule this holding. Both aggravated-robbery offenses under R.C. 2911.01(A)(1) and 2911.01(A)(3) required that the state prove a mens rea. And an indictment that fails to state the mens rea for those offenses is defective.
 {¶ 12} Having concluded that the indictment in this case was defective. We must determine whether we should proceed with a structural-or a plain-error analysis. We conclude that a plain-error analysis applies here. Unlike in Colon I, the defective indictment in this case did not permeate the proceedings. Canyon's defense was not that he did not have the appropriate mens rea to have committed the crimes. Rather, he denied that he was involved at all in the shooting.
 {¶ 13} Under this analysis, we can conclude that there was plain error only if the outcome of the trial would have been different, but for the error. We cannot so conclude. The trial testimony made clear that the person who committed the offenses had acted knowingly. There was no question about the shooter's mens rea. Rather, at issue was the identity of the shooter. We conclude that the defect in the indictment was not outcome-determinative. The first assignment of error is overruled. *Page 6 
 Jury Issues {¶ 14} Because they are related, we consider Canyon's second and third assignment of errors together. In the second, he asserts that the trial court erred when it failed to excuse jurors who had been approached by a witness outside the courtroom. And in the third, he asserts that the trial court erred when it denied his request for a mistrial when the two jurors' ability to remain fair and impartial had been compromised.
 {¶ 15} Before the second day of the trial began, jurors seven and eight informed the trial court's bailiff that they had been approached by one of the witnesses. The trial court conducted a voir dire of the entire jury and questioned Justin Nixon, the witness who had approached the jurors. The jurors stated that they could remain fair and impartial, despite Nixon's attempted communication. And Nixon told the court that he had been merely trying to ask the jurors if the trial was over for the day. After conducting the voir dire of the jury and questioning Nixon, the trial court denied Canyon's motion to dismiss jurors seven and eight and denied his request to declare a mistrial based on the incident.
 {¶ 16} The burden was on Canyon to establish that any attempted communication between Nixon and the jurors had biased the jurors.[6]
Canyon failed to establish any bias. Further, the trial court had broad discretion to deal with outside communication and to determine whether to declare a mistrial or to replace a juror.[7] We conclude that the trial court did not abuse its discretion here. The second and third assignments of error are overruled. *Page 7 
 Prosecutorial Misconduct {¶ 17} Canyon's fourth assignment of error is that he was deprived of a fair trial due to prosecutorial misconduct. Specifically, he argues that the prosecutor repeatedly asked leading questions. We must determine whether the prosecutor's questions were improper, and if so, whether they affected a substantial right of Canyon's.[8]
 {¶ 18} During the trial, Canyon objected to only two of the many questions that he now claims were leading questions. One of his objections was sustained. During the direct examination of Justin Nixon, the prosecutor asked, "Last October the 23rd, did you have occasion to be riding around in a tan Cougar car that Isiah Bealer was driving?" Nixon responded, "Last what?" The prosecutor replied, "October 23rd, the night you end up getting chased by some people." Defense counsel's objection was sustained, and the prosecutor did not ask the leading question again. We conclude that that question did not affect a substantial right.
 {¶ 19} Canyon's counsel also objected when the prosecutor asked Isiah Bealer, "Do you remember telling [Detective Pitsch] that a person named Jimmy was in your car?" According to the prosecutor, he had asked a leading question so that he could impeach Bealer with his prior statement. The trial court allowed the question. We conclude that this was not an abuse of discretion.[9] And the prosecutor's question was not improper.
 {¶ 20} Canyon did not object to the other questions. Thus, he has waived all but plain error.[10] Having reviewed the record, we conclude that the prosecutor resorted to leading questions to move the trial along, not to influence his witnesses' *Page 8 
testimony.[11] And even if the questions had been improper, given the eyewitness testimony, we cannot say that the outcome of the trial would have been different had leading questions not been asked. The fourth assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 21} In his fifth assignment of error, Canyon asserts that he was deprived of the effective assistance of counsel. To prevail on this assignment of error, Canyon must demonstrate that his counsel's performance was deficient and that, absent his counsel's errors, the result of the trial would have been different.[12] Our review of counsel's performance must be "highly deferential."[13]
 {¶ 22} Canyon contends that his counsel's performance was deficient because he did not file a motion to suppress the identification by Nelson, Denny, Davis, and Hoover; failed to conduct a meaningful voir dire during jury selection; failed to ask for an expert to testify about eyewitness testimony; failed to object to the prosecutor's leading questions; failed to object to the admission of hearsay testimony; failed to object to the admission of evidence of other crimes or bad acts; and failed to request an in camera inspection of all witness statements. We consider each of these claims in turn.
 {¶ 23} "Failure to file a suppression motion does not constitute per se ineffective assistance of counsel."[14] Counsel's failure to file a motion to suppress the photographic identification of Canyon would be prejudicial only if there was a probability of success on the motion.[15] On the record before us, we are not persuaded that a motion to suppress would have been successful. *Page 9 
 {¶ 24} To have succeeded on his motion to suppress the photographic identification of Canyon by Hoover, Davis, and Denny, Canyon would have had to have demonstrated that the identification procedure was unduly suggestive and that the identification was unreliable.[16] We note first that the array that Detective Pitsch showed Hoover, Davis, and Denny was not itself unduly suggestive. The array consisted of six photographs of men who shared physical characteristics.
 {¶ 25} Canyon argues that comments made by Detective Pitsch while showing the array to Davis, Hoover, and Denny made the procedure unduly suggestive. Davis testified that Detective Pitsch had "just told me to pick out the shooter. [Pitsch] said see if you recognize any of those guys." Hoover stated that Detective Pitsch had said "that he believed the guy that did it was on the paper, and he wanted me to take a look at it." And according to Denny, "[Pitsch] said, look at this lineup and see if you can identify the right person." Detective Pitsch's testimony differed from that of Davis, Hoover, and Denny. According to Detective Pitsch, he "asked [Davis] to take a look at this and see if there was anyone in this that could have possibly been the shooter in this case." During direct examination, Detective Pitsch testified that he told Hoover, "[I]f the guy is in here from the shooting, please pick him out." On cross-examination, he stated, "I told [Hoover] I thought we had a possible suspect, and if he could look at the photo array, see if he was in there." Finally, Detective Pitsch stated that he told Denny "just to take a look and see if the person who had shot John Davis was in the lineup."
 {¶ 26} It is possible that, had the trial court believed the testimony of Davis, Hoover, and Denny, rather than Detective Pitsch's, it could have found that the identification procedure was unduly suggestive. Canyon would then have had the *Page 10 
burden to show that the identifications made by Davis, Hoover, and Denny were unreliable. But there is nothing in the record to indicate that there was a "substantial likelihood of misidentification."[17] Even Canyon's appellate brief does not contend that the identifications were unreliable. Rather, he argues that a motion to suppress should have been filed to determine if they were. On the record before us, we cannot conclude that had defense counsel filed a motion to suppress, it would probably have been successful.
 {¶ 27} Canyon also insists that his trial counsel did not conduct a meaningful voir dire. But he does not allege that there was a problem with the jury that was selected, and we will not second-guess trial counsel's strategy in choosing the jury. He also maintains that his counsel should have requested an expert in identification testimony at state expense. Absent a demonstration in the record that such an expert's testimony would have resulted in a different trial outcome, we will not second-guess trial counsel's decision to challenge the identification testimony through cross-examination, rather than with an expert witness.[18]
 {¶ 28} Canyon next raises his counsel's failure to object to many of the prosecutor's leading questions. As we have already discussed, most of the questions were leading to move the trial along. It is likely that counsel did not want to interrupt the flow of the trial by objecting to questions that were not prejudicial. We will not second-guess this approach.
 {¶ 29} Canyon also takes issue with his counsel's failure to object to hearsay testimony by Officer Marcum. Officer Marcum testified that he had received a broadcast about a car that had been run off the road. According to the broadcast, the occupants of the car had fled. According to Officer Marcum, when he arrived at the car, three men — Isiah Bealer, Justin Nixon, and Darius Lemon — walked out of the woods and approached *Page 11 
him. With no objection from defense counsel, Officer Marcum testified that the men told him that they had been chased by a white Cadillac. The trial court sustained defense counsel's objection when the prosecutor asked whether any of the men mentioned Canyon. We conclude that Officer Marcum's statements were admissible to explain the course of the investigation.
 {¶ 30} Canyon also argues that his counsel should have objected when the prosecutor asked Anthony Nelson, "Is [Canyon] in that business? Does he sell marijuana?" Nelson responded, "I mean, he did like, you know." Canyon asserts that the statement amounted to impermissible other-acts testimony. But the prosecutor was establishing why Nelson had handed his phone to Canyon when Davis called seeking marijuana. That phone call, according to the state, set up the robbery. We conclude that Nelson's statements were admissible because they were probative of Canyon's opportunity to commit the offenses.[19] And even if the statements were improper, we cannot say that had the trial court not permitted them, the result of the trial would have been different.
 {¶ 31} Finally, Canyon asserts that his counsel was ineffective because he did not request an in camera inspection of witness statements. Canyon does not explain how such an inspection would have changed the result of the trial, and we cannot say that counsel's performance fell below an objective standard of reasonableness in this respect.[20] The fifth assignment of error is overruled.
 Sufficiency and Weight of the Evidence {¶ 32} We next consider Canyon's seventh and eighth assignments of error, in which he challenges the sufficiency and the weight of the evidence upon which his convictions were based. A sufficiency argument challenges whether the state *Page 12 
presented adequate evidence on each element of the offense.[21] On the other hand, when reviewing whether a judgment is against the manifest weight of the evidence, we must determine whether the jury clearly lost its way and created a manifest miscarriage of justice.[22] We conclude that the state presented sufficient evidence of each of the offenses for which Canyon was convicted. And having reviewed all the evidence, we cannot conclude that the jury's verdict was against the manifest weight of the evidence. The seventh and eighth assignments of error are not well taken.
 Sentencing {¶ 33} Canyon's sixth assignment of error is that the trial court erred when it imposed consecutive sentences for aggravated robbery and felonious assault. He contends that the offenses are allied offenses of similar import.
 {¶ 34} A defendant cannot be convicted of two offenses if they are allied offenses of similar import.[23] Offenses are allied offenses of similar import "if, in comparing the elements of the offenses in the abstract, the offenses are so similar that the commission of one offense will necessarily result in commission of the other. "[24] Canyon was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which requires having a deadly weapon and either displaying it, brandishing it, indicating possession of it, or using it, while committing a theft offense, and felonious assault in violation of R.C. 2903.11(A)(1), which requires causing serious physical harm. Commission of one of the offenses does not necessarily result in commission of the other. *Page 13 
 {¶ 35} Our conclusion comports with State v. Brown, in which the Ohio Supreme Court held that courts must consider the legislative intent behind the statutes when determining whether two offenses are allied offenses of similar import.[25] The Ohio Supreme Court recognized that the legislature's intent in drafting the aggravated-robbery statute was not only to protect property but "to punish the potential for harm to persons as well as actual harm."[26] The felonious-assault statute was not enacted to protect property. Rather, the statute was intended to prevent physical harm to persons.[27] The additional societal interest protected by the aggravated-robbery statute — property — evinces a legislative intent to consider the offenses as having different imports. The sixth assignment of error is overruled.
 {¶ 36} We, therefore, affirm the judgments of the trial court.
Judgments affirmed.
PAINTER, P.J., and CUNNINGHAM, J., concur.
[1] 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, syllabus.
[2] State v. Colon (Colon II), 119 Ohio St.3d 204, 2008-Ohio-3749,885 N.E.2d 917, ¶ 8.
[3] Id.
[4] State v. Fisher, 99 Ohio St.3d 127, 2003-Ohio-2761,789 N.E.2d 222, at ¶ 9.
[5] 1st Dist. No. C-070383, 2008-Ohio-3570.
[6] State v. Phillips, 74 Ohio St.3d 72, 88, 1995-Ohio-171,656 N.E.2d 643.
[7] Id. at 89.
[8] State v. Smith (1984), 14 Ohio St.3d 13, 14-15,470 N.E.2d 883.
[9] See State v. Meyers, 2d Dist. No. 2006 CA 2, 2006-Ohio-6125.
[10] State v. Hanna, 95 Ohio St.3d 285, 2002-Ohio-2221,767 N.E.2d 678, ¶ 77.
[11] See Evid. R. 611(C).
[12] See State v. Bradley (1989), 42 Ohio St.3d 136, 142,538 N.E.2d 373; Strickland v. Washington(1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[13] Strickland, supra, at 689.
[14] Kimmelman v. Morrison (1986), 477 U.S. 365, 384,106 S.Ct. 2574.
[15] State v. O'Hara (June 29, 2001), 1st Dist. Nos. C-000314 and C-000318.
[16] State v. Waddy (1992), 63 Ohio St.3d 424, 438,588 N.E.2d 819.
[17] State v. Haynes, 1st Dist. No. C-020685,2004-Ohio-762.
[18] See State v. Madrigal, 87 Ohio St.3d 378, 390-391, 2000-Ohio-448,721 N.E.2d 52.
[19] Evid. R. 404(B).
[20] Strickland, supra, at 687.
[21] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[22] See id. at 387.
[23] R.C. 2941.25(A).
[24] State v. Cabrales, 118 Ohio St.3d 54, 2008-Ohio-1625,886 N.E.2d 181, paragraph one of the syllabus.
[25] 119 Ohio St.3d 447, 2008-Ohio-4569, 985 N.E.2d 149, at ¶ 37.
[26] State v. Wharf, 86 Ohio St.3d 375, 378, 1999-Ohio-112,715 N.E.2d 172, citing State v. Edwards(1976), 50 Ohio App.2d 63,361 N.E.2d 1083.
[27] State v. Nesbitt, 1st Dist. No. C-080010,2009-Ohio-972, at ¶ 32. See, also, Brown, supra, at ¶ 39, citingWhalen v. United States (1980), 445 U.S. 684, 100 S.Ct. 1432 (Rehnquist, J., dissenting). *Page 1